

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

FJN:NB/TBM                                    *271 Cadman Plaza East*
F. #2017R01335                                *Brooklyn, New York 11201*

April 30, 2022

<u>By Email</u>

The Honorable Sanket J. Bulsara
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re: United States v. Mohamad Yassine and Hassan Rahman
       <u>Criminal Docket No. 18-137 (S-1) (EK)</u>

Dear Judge Bulsara:

    The government respectfully submits this letter in support of its motion for a permanent order of detention for the defendants Mohamad Yassine and Hassan Rahman, who are scheduled to be arraigned on Monday, May 2, 2022, on the above-referenced first superseding indictment (the "Superseding Indictment"), following their extradition from Georgia.

    On January 29, 2020, a grand jury sitting in the Eastern District of New York returned the Superseding Indictment charging the defendants with money laundering conspiracy and money laundering.  That same day arrest warrants were issued for the defendants' arrests.

    On September 25, 2021, the defendants were arrested in Tbilisi, Georgia at the government's request pursuant to provisional arrest warrants.  On or about October 19, 2021, the government submitted a request to the Georgian authorities for the extradition of both defendants.  Following contested extradition proceedings in Georgia, the Georgian Ministry of Justice granted the United States' request and, earlier today, Georgia extradited the defendants to the United States.

    For the reasons set forth below, at the defendants' initial appearances and arraignments, the Court should enter permanent orders of detention, as no combination of conditions can secure the defendants' appearances at trial.

I.      Background

        The defendants are charged in a two-count superseding indictment with participating in an international money laundering conspiracy and laundering what they believed were drug proceeds, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(3)(A) and 1956(a)(3)(B).  The offenses span from approximately June 2017 through approximately March 2018.

        Yassine and Hassan are both citizens and residents of Lebanon, which does not have an extradition treaty with the United States.  Neither has immigration status in the United States, nor known significant familial or other ties to the country.

        The Drug Enforcement Administration ("DEA") investigation showed that, between approximately June 2017 and March 2018, Yassine led a sophisticated Lebanon-based money laundering organization ("MLO"), of which Rahman was also a member.  The MLO collected, laundered, and repatriated illicit funds throughout Europe, the Middle East, South America, Australia, and the United States, in exchange for a percentage-based commission of the amount laundered.  The investigation showed that the defendants personally agreed with others to conduct financial transactions of funds they believed to be the proceeds of drug trafficking, with the intent to promote drug trafficking and to conceal and disguise the criminal source, ownership, and control of the funds.  Some of the funds the defendants laundered originated in Australia and were transferred into a bank account in Brooklyn.  The government's evidence includes video and audio recordings of meetings involving the defendants, telephone records, bank records, travel records, and witness interviews.

        In or about June 2017, a confidential source ("CS-1") contacted a member of the MLO ("Co-Conspirator 1") in Colombia and claimed to work for Colombian drug traffickers.  Co-Conspirator 1 told CS-1that the MLO had contacts with foreign government officials and the ability to assist in laundering drug proceeds.

        In or about July 2017, during a series of meetings, CS-1 and a second confidential source ("CS-2") contacted Co-Conspirator 1 and stated that they sought assistance laundering drug proceeds.  Co-Conspirator 1 stated that he could transfer proceeds to the New York area through bulk cash transfers or wire transfers.  Co-Conspirator 1 agreed to move a sum of funds from Australia to New York for a 13% commission.

        Between August and October 2017, Co-Conspirator 1 and multiple other co-conspirators twice assisted in the laundering of funds from Australia to the United States.  On one occasion, the transaction involved a money pick-up in Brooklyn, New York.  The money pick-ups in the United States were video and audio recorded and surveilled by the DEA.  In connection with these transfers, Co-Conspirator 1 stated that his superior in the MLO was Yassine.

        In October 2017, CS-1 and CS-2 met with Co-Conspirator 1 in Colombia.  That meeting was recorded.  They discussed, among other things, the past money transfers, potential future deals, and a meeting with other associates of Co-Conspirator 1.  In November 2017, CS-1 facilitated a third money transfer of $100,000 Australian dollars ("AUD") from Australia to the United States.

2

In January 2018, CS-1 and CS-2 expressed concern to Co-Conspirator 1 about the pace and logistical issues surrounding the past money transfers.  Co-Conspirator 1 provided them with Yassine's contact information to discuss these concerns.  On or about January 29, 2018, CS-1 spoke with Yassine on a recorded phone call.  They agreed to an in-person meeting the following month.

In February 2018, CS-1 and CS-2 met with Yassine in France, during a meeting that was surveilled by French law enforcement authorities.  CS-1 and CS-2 represented that they were involved in drug trafficking and sought assistance laundering drug proceeds as part of a $9 million U.S. dollar ("USD") money laundering contract.  Yassine explained that he could transfer money through France and Turkey to anywhere they wanted.  Yassine wrote on a notepad the names of the banks he used to engage in the transfers.  He also identified Rahman as a member of the MLO and as someone working for him.

On or about February 20, 2018, CS-1 informed Yassine that they were ready to move $100,000 AUD from Australia to New York.  Yassine provided a phone number for a contact who was part of the MLO and a "token"—a serial number from a paper bill that the contact would possess, so that the contact could prove he was involved in the conspiracy.  Thereafter, law enforcement provided the funds to a co-conspirator in Australia on February 28, 2018.  CS-1 spoke to Yassine in a recorded call and WhatsApp chat to confirm that the money drop occurred.  During the call, Yassine stated that "Hassan," referring to Rahman, would be directing the money for him.  On March 1, 2018, CS-1 provided Rahman with an invoice for the money that was to be transferred to the United States.  The funds were ultimately transferred to a U.S.-based bank account, and the defendants received a 17% commission.

In or about March 2018, CS-1 and CS-2 met with the defendants in the United Arab Emirates to discuss a contract to launder approximately $14 million USD of what they represented to be drug trafficking proceeds through Turkey.  CS-1 and CS-2 stated that they wanted to launder approximately $1 million USD per month.  The defendants accepted the contract.  Yassine provided a contact and a "token" to start the process.  As a result, on or about March 22, 2018, approximately $90,000 AUD was transferred to a member of the MLO in Australia, and on or about March 29, 2018 the funds were transferred into a U.S.-based bank account.  The defendants received a 15% commission on the transfer.

II.    Applicable Law

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  See 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").

While a finding of dangerousness must be supported by clear and convincing evidence, United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), risk of flight can be proven by a preponderance of the evidence, United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987).  The concept of "dangerousness" encompasses not only the effect of a defendant's release on the

safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

             Four factors guide the Court's determination of whether a defendant should be released on bail:

       (1)     the nature and circumstances of the offense charged, including whether the offense involves a . . . controlled substance . . . ;

       (2)     the weight of the evidence against the person;

       (3)     the history and characteristics of the person, including . . . the person's character, family ties, employment, financial resources, length of residence in the community, community ties, . . . past conduct . . . ; and

       (4)     the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

             Evidentiary rules do not apply at detention hearings, and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000).  In the pre-trial context, few detention hearings involve live testimony or cross-examination.  Most proceed on proffers.  See id. at 131.  This is because bail hearings are "typically informal affairs, not substitutes for trial or even for discovery."  Id. (internal quotation marks omitted).  Indeed, the Second Circuit has reversed district courts where they have not credited the government's proffer, including proffers with respect to a defendant's dangerousness.  See, e.g., United States v. Mercedes, 254 F.3d 433, 437 (2d Cir. 2001) ("[Defendant] has twice been convicted of weapon possession—one felony conviction, and one misdemeanor conviction.  We find the district court committed clear error in failing to credit the government's proffer with respect to [defendant]'s dangerousness.").

III.    Discussion

             The defendants pose a significant risk of flight.  The defendants are charged with money laundering offenses that subject them to up to 20 years' imprisonment.  Given the significant jail time the defendant faces upon conviction, the defendants both have a strong incentive to flee the jurisdiction. See United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) (summary order) ("[A] district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee."); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was flight risk because her knowledge of seriousness of charges against her gave her strong incentive to abscond to Mexico); United

States v. Dodge, 846 F. Supp. 181,184-85 (D. Conn. 1994) ("possibility of a severe sentence" heightens risk of flight).

The offenses in which the defendants are charged are far-reaching both in terms of the conspiracy's geographic footprint— which stretches from Australia to the United States to Europe to South America to the Middle East—and its scope as measured by the quantities of money that they launder and have access to.   Indeed, in the instant case, the defendants believed they were working toward securing contracts to launder many millions of dollars in drug proceeds for drug traffickers.  Their money laundering activities demonstrate their access to a well-funded, world-wide network of criminals that could support and conceal their attempted flight from prosecution should they be released.

Additionally, the defendants are charged with both laundering money to conceal and disguise the nature, location, source, ownership and control of what they believed were drug proceeds, see 18 U.S.C. § 1956(a)(3)(B), and seeking to further promote the underlying drug trafficking that generated the drug proceeds, see 18 U.S.C. § 1956(a)(3)(A).  Their conduct is thus tantamount to the seriousness of a controlled substances offense.  Indeed, the defendants' role and the services that the defendants provide to international drug traffickers is crucial, for drug traffickers would traffic controlled substances if they were not able to launder their money so they could use and further invest it.

The evidence supporting these charges is strong and includes, without limitation: (1) the audio and video recordings of calls and meetings with the defendants and a co-conspirator; (2) witness statements; (3) documentary evidence including bank records, telephone records and falsified purported business records; and (4) the money transfers themselves that form the basis for the substantive money laundering charge.

Finally, the defendants are citizens and residents of Lebanon who were arrested upon their arrival in Georgia while in transit from Turkey back to Lebanon.  Neither defendant has a history of traveling to the United States.  Neither defendant has apparent family ties to the United States, or any other significant connections to the United States.  Both defendants have strong and continuing ties to Lebanon, where they normally reside, and from where they cannot be extradited.  Given the absence of any connection to the United States and their extensive ties to Lebanon, the defendants constitute a serious risk of flight.  See, e.g., United States v. Hebroni, 37 Fed. App'x 549, 550 (2d Cir. 2002) (summary order) (reversing district court order granting bail where the defendant was charged with money laundering offenses such that the defendant faced "a sentence far exceeding the time she has already spent in detention; she lacks any ties to the United States; she has significant ties to other countries; it is questionable whether the United States could extradite her if she flees"); United States v. Boustani, 356 F. Supp. 3d 246, 255 (E.D.N.Y. 2019) (citing defendant's "complete lack of ties to the United States, and extensive ties to foreign countries without extradition" as demonstrative of defendant's serious risk of flight).

Where, as here, the United States and Lebanon do not have an extradition treaty, it would be nearly impossible for the United States to apprehend the defendants in Lebanon. There is thus significant risk that the defendants' return to Lebanon would ensure that they do not face justice in an American courtroom.  Cf. Boustani, 356 F. Supp. 3d at 255 (citing

defendant's "extensive ties to foreign countries without extradition" as demonstrating defendant's "serious risk of flight"); United States v. Epstein, 155 F. Supp. 2d 323, 326 (E.D. Pa. 2001) (finding defendant's extensive ties to Brazil, country with which United States has no extradition treaty, to be "crucial factor" in denying bail).

        Finally, any proposed use of home detention and/or electronic monitoring in lieu of detention is insufficient here considering the defendants' risk of flight described above.  Such a proposal "at best elaborately replicate[s] a detention facility without the confidence of security such a facility instills."  United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993); see United States v. Zarrab, No. 15 CR 867 (RMB), 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016). Here, such an arrangement is wholly inadequate to ensure that these defendants will not flee from justice.

IV.    <u>Conclusion</u>

        For the foregoing reasons, the government respectfully requests that the Court issue a permanent order of detention against the defendants.

Respectfully submitted,

BREON PEACE
United States Attorney

By:         /s/
           Nomi Berenson
           Tara McGrath
           Assistant U.S. Attorneys
           (718) 254-7000

cc:    Clerk of the Court (EK) (ECF)
       Deborah Colson, Esq. (by e-mail)